**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

MICHAEL MOSES,

                            Plaintiff

          v.

NATIONAL SECURITIES CORPORATION,
NATIONAL HOLDINGS CORPORATION,
B. RILEY FINANCIAL INC., and SEAN HOSEIN
a/k/a SEAN SHERWIN.

                        Defendants.

-------------------------------------------------------------------X

CIVIL ACTION NO.:  1:22-cv-08912

**COMPLAINT**

**JURY DEMAND**

       Plaintiff Michael Moses ("Moses" or "Plaintiff"), by his undersigned attorneys, Michelman

& Robinson LLP, allege for their complaint against Defendants National Securities Corporation

("National Securities"), National Holdings Corporation ("National Holdings"), B. Riley Financial

Inc. ("B. Riley"), and Sean Hosein a/k/a Sean Sherwin ("Sherwin") as follows:

## NATURE OF ACTION

       1.     This case involves investment advisors who put their own financial interests ahead

of their customer's best interest by engaging in a pattern of churning and unauthorized trading

designed to generate excessive commissions and fees without regard for the losses incurred by

their customer, Michael Moses. As a result of the churning and unauthorized trading alleged

herein, Moses lost nearly $2.2 million while Defendants and others earned upwards of $370,000

in fees and commissions.

1

2.      In reliance on representations made to him, Moses deposited with Defendants approximately $2.5 million for investment purposes, $1.25 million of which was expressly designated to be used to purchase and hold pre-IPO shares of a technology stock called Palantir Technologies, Inc. ("Palantir"). Thereafter, from 2016 through early 2022—an unprecedented period of economic growth and prosperity for investors—Moses's entire initial investment of over $2.5 million was churned and squandered to a paltry $354,422.35 as of May 31, 2022. With respect to the Palantir stock, Sherwin disregarded Moses's express instructions to hold the stock, and instead sold it to raise cash in the account. Sherwin then used that cash for one last round of churning, rather than preserve Moses's capital as he had instructed.

3.      When the account value collapsed precipitously, Moses discovered for the first time that he had been defrauded. As a result of Sherwin's churning, which Sherwin's supervisors failed to identify and stop, Moses was not only left out of the significant return enjoyed by most investors during this time period, but he lost nearly all of the money that he had earmarked to be held in Palantir shares. As a result of the Defendants' willful actions, Moses has suffered significant damages in an amount to be proven at trial.

## **PARTIES**

4.      Plaintiff Michael Moses is an individual residing in Port of Spain, Republic of Trinidad and Tobago.

5.      Defendant National Securities Corporation is a Washington corporation that maintains an office located at 80 Broad Street, 29th Floor, New York, New York. National Securities Corporation (NSC) is a full-service brokerage firm, operated primarily through independent registered representatives.

6.     National Securities Corporation's parent company is National Holdings Corporation. National Holdings Corporation is a Delaware Corporation that maintains an office located at 200 Vesey Street, New York, NY.

7.     National Holdings Corporation is a wholly owned subsidiary of B. Riley Financial, Inc., parent company to B. Riley Securities, Inc. and B. Riley Wealth Management, Inc. Accordingly, National Holdings Corporation and its subsidiaries are affiliates of B. Riley Securities, Inc. and B. Riley Wealth Management, Inc.

8.     B. Riley Financial, Inc. is a Delaware Corporation that maintains numerous offices throughout the State of New York, including in Manhattan, Long Island and the Bronx.  National Securities now does business as B. Riley Wealth.  B. Riley Wealth is a wealth management and financial planning platform, providing clients with services including brokerage, investment management, insurance and tax preparation.

9.     Defendant Sherwin is a securities broker and investment advisor who, during the relevant timeframe, provided investment advice to and executed trades on behalf of Moses. On information and belief, Sherwin was employed by and/or associated with Forte and/or National Securities from at least 2016 to in or around 2022. At all relevant times, Sherwin was registered as a broker-dealer with FINRA and held Series 7 and 63 licenses. Upon information and belief, Sherwin is a resident of the State of New York and was a resident of the State of New York at all relevant times.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2).

11.     This Court has subject matter jurisdiction over claims herein pursuant to 28 U.S.C. §§ 1331 and 1367.

12.     This Court has personal jurisdiction over defendant Sherwin, who conducted significant business from New York, and who, on information and belief, resides in New York.

13.     This Court has personal jurisdiction over defendant National Securities, National Holdings and B. Riley, each of which maintains an office and employs personnel in New York and in this District and are thus physically present in the state.

14.     The events alleged herein occurred in the State of New York and the causes of action claimed herein arise from actions taken in New York.

15.     Venue in this district is proper under Section 27 of the Exchange Act, 15 U.S.C. §78aa. Certain of the sales of securities and acts, practices, transactions, and courses of business constituting the violations alleged in the Complaint occurred within the Southern District of New York and were effected, directly or indirectly, by making use of the means, instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges.

16.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and (c).

17.     Moses hereby demands a jury trial.

## FACTS ALLEGED

**A.      Sherwin Solicits Moses to Open an Investment Account at National Securities through Forte Capital Group, Inc.**

18.     Moses was introduced to Sherwin in or around 2014 by a mutual friend. During Sherwin's conversations with Moses, Sherwin sought to convince Moses to enter into an investment advisory relationship with Forte Capital Group, Inc. ("Forte"), Moses's employer. Forte provided brokerage services through National Securities, which is now owned by National Holding and B. Riley. In order to do so, Sherwin claimed to have 25 years of securities trading and investment advisory experience. He repeated this claim several times throughout their relationship

4

to reassure Moses. As further means of gaining Moses's trust and confidence, Sherwin further claimed to have significant expertise in Moses's home region, the Caribbean, and to have represented Trinidadian clients, like Moses, in the past.

19.     Over the next two years, Moses and Sherwin communicated several times, during which Sherwin continued to solicit Moses to open an investment account with Forte and National Securities.

20.     On information, and belief, in 2022 Forte Capital Group, Inc. merged into Ceros Financial Services, Inc ("Ceros") and continues to operate as a division of Ceros. Ceros is a Massachusetts corporation that provides investment and advisory services. Forte Capital Group is a New York Corporation and maintains an office at 80 Broad Street, 29th Floor, New York, New York.

21.     In or around 2016, Moses traveled to New York City to meet Sherwin in person and further discuss opening an investment account with Forte and National Securities. Sherwin proposed a two-prong investment strategy to Moses. First, Sherwin recommended that Moses open a brokerage account with Forte and National Securities wherein Sherwin would execute trades in public securities on Moses's behalf. Second, Sherwin recommended that Moses purchase private placement shares of pre-IPO companies to which Sherwin had access.

22.     Moses agreed to the strategy proposed by Sherwin. Sherwin, however, never disclosed or fully explained to Moses how he intended to use margin in Moses's accounts or the excessive commissions and fees that would be incurred through the use of margin.

23.     On the basis of this agreed-upon strategy, Moses ultimately agreed to enter into an investment advisory relationship with Forte and National Securities, with Sherwin acting as Moses's advisor and broker.

**B.     Moses Funds the Investment Account**

24.     On or about the following dates, Moses transferred to Forte, in New York, the following personal capital for use in Moses's investment account through National Securities:

| Date | Amount |
|------|--------|
| August 16, 2016 | $49,965.00 |
| September 30, 2016 | $99,965.00 |
| November 16, 2016 | $49,965.00 |
| January 4, 2017 | $99,965.00 |
| March 2, 2017 | $99,965.00 |

25.     On or about the following dates, Moses transferred to Forte the following personal and family capital for the express purpose of purchasing pre-IPO shares of Palantir, a software company specializing in big data analytics through National Securities:

| Date | Amount |
|------|--------|
| April 26, 2017 | $249,960.00 |
| April 27, 2017 | $999,955.00 |

26.     At or around the time of the transfers identified in the preceding paragraph, Moses expressly instructed Sherwin that the $1.25 million transferred to Defendants in order to purchase shares of Palantir was to be used only to purchase Palantir, which was intended to be a safe and stable investment. Moses understood that Sherwin would be making trades on his behalf in the Brokerage Account but instructed that the Palantir investment was outside of the discretion granted to Sherwin. Sherwin was not authorized to trade or sell the shares that ultimately resulted from the Palantir IPO. Sherwin acknowledged this instruction, and at no point did Moses's instructions change. Therefore, at no point was Sherwin authorized to sell the Palantir shares or to use the proceeds for trading in the Brokerage Account.

27.     Sherwin also invested approximately $100,000 of Moses's funds in a pre-IPO investment in Lyft, Inc ("Lyft"). Moses sent Sherwin $100,000 for the purchase of the pre-IPO

Lyft shares and advised Sherwin that the $100,000 was to be used specifically for this purchase. However, Sherwin never registered the funds in Moses' name. Moses has repeatedly asked Sherwin and other representatives at Forte to register the shares in his name. To date, the shares have not been registered to Moses.

28.     Moses permitted Sherwin to trade in the Brokerage Account on Moses's behalf with the funds that were not earmarked for pre-IPO placements. Moses assumed, wrongly, that Sherwin would exercise discretion over the non-Palantir portion of his investment account in a reasonable and prudent manner, by selecting investments suitable to Moses's investment objective and risk tolerance, and without entering into needless securities trades that did nothing for Moses but instead earned commissions and fees for the Defendants and others.

29.     After the Palantir investment was funded, there was approximately $1 million left in the Brokerage Account. Without Moses's knowledge, Sherwin immediately began to churn the account. This trading activity is reflected in the trade confirmations recently received from National Securities. True and accurate copies of these trade confirmations are attached hereto as **Exhibits 1-5.**

   **C.     Moses's Investment Advisors Engaged in Illegal Churning While Charging Exorbitant Commissions to Moses.**

30.     Sherwin was required to have a reasonable basis to believe that his recommendations were suitable for Moses. He needed to conduct due diligence and have an understanding of the recommendations' risks and rewards, and potential consequences to Moses. Given that Sherwin executed a pattern of in-and-out trading, he had a duty to determine whether his strategy, which imposed exceedingly high costs on Moses, was suitable and in Moses's best interests.

31.     At a high level, Sherwin executed a pattern of trading wherein he would regularly buy and sell over a million dollars in securities in a single month. At times, he would buy and sell the same security within days. This trading activity was also largely done on margin, enhancing the risks and costs to Moses.

32.     Sherwin immediately began churning the $1 million in the Brokerage Account that was left over after the purchase of the Palantir pre-IPO shares. In May of 2017, Sherwin used this remaining $1 million to purchase over $1.6 million in assets on the New York Stock Exchange and other exchanges, including in New York.

33.     "Churning" occurs when a registered representative controls the trading in a customer's account and excessively trades the customer's funds in light of the customer's investment objectives, while knowingly or recklessly disregarding the customer's interests.

34.     One metric used to detect potential churning in a customer's brokerage account is the "annual turnover rate." An annual turnover rate compares the aggregate cost of the trades placed on a customer's behalf to the average month-end value of a customer's account. An annual turnover rate is calculated by dividing the gross dollar value of equity (securities or investments) purchased in a customer's account during a given period by the average month-end value of the securities or investments in the account during that same period. For example, if a customer purchased $10 million in securities in one year, and the average month-end equity in that customer's account was $1 million during that 12-month period, the account turned over ten times or, in other words, the annual turnover rate was ten. An annual turnover rate of six or higher, depending on the account's objectives, reflects excessive trading. Excessive trading is a component of churning, along with the registered representative assuming control over an

account's trading and that registered representative's knowing or reckless disregard of a customer's interests.

35.     There is no single annual turnover rate that is universally recognized as being determinative of churning. Where the annual turnover rate exceeds six, churning is *assumed*. However, churning rates of less than six have regularly been held to be indicative of churning.

36.     The trading activity directed by Sherwin resulted in the following annual turnover rates during the 12-month periods beginning on the following dates:

| 12-Month Period Beginning | Annual Turnover Rate |
|---------------------------|---------------------|
| May 1, 2017 | 6.27 |
| May 1, 2018 | 6.30 |
| May 1, 2019 | 5.03 |
| May 1, 2020 | 1.77 |
| May 1, 2021 | 5.10 |

37.     In sum, during the 61-month period beginning May 1, 2017 to May 31, 2022, the Brokerage Account had been turned over nearly 25 times.

38.     The unlawful churning of Moses's account was made exponentially worse by the use of margin to increase Moses's buying power. At times, the margin balance of the account exceeded $2,000,000. This use of margin drastically increased the number of shares Sherwin could buy in the Brokerage Account, thus further increasing the commissions charged to Moses's account by Defendants and others.

39.     During the relevant period, Moses was charged no less than $372,716.13 in commissions, handling fees, and miscellaneous fees. The commissions charged quickly became outrageous. For example, on January 4, 2017, the Moses was charged $7,000 in commission for a single trade. More often, though, the Moses was charged $1,000, $1,500, or even $2,000 per trade.

40.     One example of excessive fees is Sherwin's trades in Robinhood Markets Inc. ("HOOD"). In September of 2020 alone, Sherwin executed the following trades in HOOD:

| Date | Transaction | Qty | Price | Principal | Commissions & Fees |
|------|-------------|-----|-------|-----------|--------------------|
| 9/7/21 | Purchase | 5,000 | 43.95000 | ($214,750.00) | $1,040.00 |
| 9/7/21 | Purchase | 5,000 | 43.01000 | ($215,050.00) | $1,040.00 |
| 9/8/21 | Purchase | 5,000 | 41.15000 | ($205,750.00) | $940.00 |
| 9/13/21 | Purchase | 5,000 | 40.11000 | ($200,550.00) | $940.00 |
| 9/22/21 | Sale | 5,000 | 45.00000 | $225,000.00 | $1,041.15 |
| 9/22/21 | Sale | 5,000 | 45.00000 | $225,000.00 | $1,041.15 |
| 9/22/21 | Sale | 5,000 | 46.25000 | $231,250.00 | $1,141.18 |
| 9/23/21 | Sale | 5,000 | 46.90000 | $234,500.00 | $1,041.20 |

41.     In this series of trades, Sherwin spread what could have been two separate transactions into eight, all executed within days of one another. As a result of these trades, the Defendants and others obtained $79,650.00 in returns, but were charged $8,224.68 in fees and commissions. Therefore, on this set of trades, Moses paid the Defendants and others 10% of his return. Had these trades been conducted as a single purchase and a single sale, the industry average of approximately $150 per trade would have resulted in $300 in commissions for the Defendants rather than $8,224.68.

42.     Moses did not receive proper or actual notice of Sherwin's unauthorized and excessive trading activity. To the extent Moses was mailed trade confirmations, the sheer volume of those confirmations made them an impractical and unreasonable mechanism for Moses to monitor Sherwin's trading activity. In fact, Sherwin likely intended for this avalanche of trading confirmations to obfuscate his fraud and allow him to later claim Moses was somehow on notice of excessive trading, churning, and unauthorized trading of Palantir stock.

43.     Moses had no reason to believe he was the target of a fraudulent scheme or that his account was being churned for the benefit of Sherwin. He always believed he owned around 125,000 shares of Palantir which he understood had appreciated significantly in value. Moses,

therefore, knew that his account had at least the value of the Palantir shares in it, as Sherwin was instructed not to trade in Palantir shares after the initial IPO.

44.     Although Moses did not monitor his account on a trade-by-trade basis, Moses on occasion reviewed his overall account balance. Several times, Moses questioned Sherwin as to whether the poor performance of the Brokerage Account necessitates a different trading strategy. Each time, Sherwin would reassure him that he had 25 years of experience, and that the positions would "all come back." Because Moses knew the Palantir shares were safely invested, Moses trusted Sherwin and permitted him to continue to trade on his behalf.

**D.    Sherwin Liquidates and Churns the Palantir Shares**

45.     On March 4, 2021, after the Palantir IPO, 124,462 shares of Palantir were transferred into the Brokerage Account. The Brokerage Account statement for March of 2021 reflected Palantir's price as $23.29 per share, meaning that Moses's $1.25 million investment was now worth $2,898,719.98. These were the very shares Moses had repeatedly instructed Sherwin not to sell, and that Sherwin confirmed would not be sold.

46.     Notwithstanding Moses's express instructions, and without Moses's authorization or knowledge, Sherwin began selling the Palantir shares as follows:

| Date | Palantir Shares Sold by Sherwin |
|---|---|
| April 13, 2021 | 9,000 |
| April 26, 2021 | 5,462 |
| April 27, 2021 | 10,000 |
| May 11, 2021 | 10,000 |
| June 10, 2021 | 10,000 |
| June 15, 2021 | 9,000 |
| June 23, 2021 | 9,000 |
| June 24, 2021 | 9,000 |
| August 12, 2021 | 8,000 |
| August 31, 2021 | 9,000 |
| September 2, 2021 | 9,000 |
| September 13, 2021 | 7,000 |
| December 6, 2021 | 20,000 |

47.     None of these sales were authorized by Moses; Moses had specifically instructed Sherwin *not* to trade the Palantir shares. Moreover, Moses never authorized Sherwin to use proceeds of Palantir sales to purchase other securities. Because Moses had earmarked these funds as funds that would be held in Palantir, he had expected them to be a safe investment and not subject to Sherwin's trading. However, by December 6, 2021, without Moses's authorization, Sherwin had liquidated Moses's entire investment in Palantir.

### E.     Sherwin Decimates the Brokerage Account by Using the Off-Limits Palantir Funds for Further Churning

48.     Shortly after he finished selling the Palantir shares against Moses's express instructions, Sherwin engaged in one last push to churn the Brokerage Account, with disastrous consequences.

49.     As of December 31, 2021, the Brokerage Account held $5,004,965.14 in net portfolio assets. Less than six months later, by May 31, 2022, its value had dwindled to just $281,700.20 in net portfolio assets. Less than $17,000 was withdrawn from the Brokerage Account by Moses during this time period. In other words, the diminution in account value was attributable entirely to Sherwin's ruinous churning and not to customer withdrawals.

50.     During this final period of trading, Sherwin continued to purchase and sell securities at a rapid pace, locking in significant capital losses, all the while charging further commissions to Moses.

51.     In December of 2021, Sherwin sold approximately $850,000 in securities, and purchased approximately $1.18 million in securities. The net portfolio value at the end of December of 2021 was approximately $2.14 million.

52.     In January of 2022, Sherwin sold approximately $1.94 million in securities, and again purchased approximately $1.18 million in securities. The net portfolio value at the end of January of 2022 was approximately $1.35 million.

53.     By the time of the May 31, 2022 account statement, the net portfolio value was $354,422.35, and the annual turnover rate of the account for the trailing 12 months was 5.23. This turnover rate is highly indicative of churning.

### F.     Sherwin is Removed from Moses's Account

54.     On May 23, 2022, Peter Phan, a Senior Vice President at Forte/National Securities, contacted Moses via email. This email stated the following:

> Hello Michael,
> My name is Peter Phan.
> I am trying to get a hold of you for a couple of reasons.
> Sean Sherwin- your broker of record on your account is no longer with us and I have been assigned to help you.
> You also have a margin call due on your account and I wanted to help you address it.
> Please let me know what is your best time and number to reach you.
> Unfortunately this is time sensitive.
> Thank you and I look forward to hearing from you.

55.     This was the first time that Moses was informed of any issues with the Brokerage Account. When he learned of the disastrous account performance, he reviewed the trade statements and found for the first time that Sherwin had sold all of the Palantir shares, among other unauthorized conduct.

56.     Moses has repeatedly requested from Phan all information relating to his accounts and has received only: (a) an incomplete set of account statements; (b) an incomplete set of trade confirmations; (c) an account agreement with the clearing firm through which the Brokerage Account trades were cleared; and (d) a one-page attestation to National Securities.

57.     Despite his express requests, neither Phan, Forte, nor National Securities have provided Moses with a copy of an account agreement governing their relationship.

58.     On or about August 16, 2022, Moses contacted Phan by telephone to request further information and to transfer what remained of the Brokerage Account to another institution. At that time, Phan informed Moses that he was "advised not to speak with him," and that there is no further information about Moses's accounts because "the servers were wiped clean."

59.     Despite Moses's express request for an in-kind transfer of his remaining assets to a different institution, as of the date of this Complaint, the transfer has not occurred.

60.     Further, Moses learned that Sherwin, National Securities, and the other Defendants have all failed to register in Moses's name the Lyft shares resulting from Moses's pre-IPO investment. None of these shares have been placed in Moses's account, preventing him from domesticating or liquidating his shares.

61.     Moses has repeatedly requested the shares be registered in his name, however to date, the shares have not been registered to him.

**G.     Sherwin Acted as National Securities, National Holdings and B. Riley's Agent**

62.     Sherwin acted as the agent of National Securities, National Holdings and B. Riley throughout his relationship with Moses, that is, he acted on behalf of National Securities, National Holdings and B. Riley and was subject to their control. When he communicated with Moses, Sherwin fostered Moses' contractual relationship with National Securities, National Holdings and B. Riley rendering them vicariously liable for Sherwin's misconduct.

63.     National Securities, National Holdings and B. Riley allowed Sherwin to introduce Moses to the market using National Securities, National Holdings and B. Riley's reputation, documents, materials, and platform.

64.     National Securities, National Holdings and B. Riley controlled Sherwin's ability to use their documents and allowed Sherwin to contract with Moses on their behalf.

65.     Neither National Securities, National Holdings, nor B. Riley took adequate steps to ensure that Sherwin was accurately representing the risks associated with the investments Sherwin selected on Moses's behalf, nor did they properly supervise Sherwin's activities.

66.     National Securities, National Holdings, B. Riley and Sherwin all profited handsomely from Moses's losses. Sherwin entered into a contractual relationship with Moses for the sole purpose of generating commissions for the Defendants at Moses's expense.

**FIRST CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY**
**(all Defendants)**

67.     Plaintiff incorporates the foregoing paragraphs 1 through 66 as if fully set forth herein.

68.     National Securities, National Holdings, B. Riley and Sherwin each had a fiduciary duty to Moses arising under applicable law and the laws of the State of New York. Those duties include, but are not limited to, the fiduciary duties of loyalty, honesty and good faith in their dealings with Moses.

69.     National Securities, National Holdings, B. Riley and Sherwin breached their fiduciary duties to Moses by, among other things: (a) churning the accounts to create commissions and fees for themselves; (b) following trading methods as described above, which were in complete and reckless disregard for the financial and investment needs and objectives of Moses; (c) making investments and using trading methods as described above, which were unsuitable for Moses and made it highly likely that Moses would realize substantial losses; and (d)

selling the Palantir shares against Moses's express instructions, and using those funds to further churn Moses's account.

70.     National Securities, National Holdings, and B. Riley further breached their fiduciary duties to Moses when they allowed their agent Sherwin to cheat and defraud or attempt to cheat and defraud Moses, while fostering a contractual relationship between Moses and Sherwin.

71.     These actions taken by National Securities, National Holdings, B. Riley and Sherwin, in breach of their fiduciary duties, were morally reprehensible as they were done willfully, maliciously, and with a wanton disregard for Moses's investment needs and objectives. Furthermore, the actions were done with an improper motive to enrich themselves and their respective employees, agents and/or representatives with excessive commissions which would have never been realized had Moses's accounts been managed in accordance with his investment needs and objectives and applicable law.

72.     As a result of National Securities, National Holdings, B. Riley and Sherwin's breaches of fiduciary duty, Moses has been damaged in an amount to be determined at trial.

### SECOND CAUSE OF ACTION

### FRAUD
### (all Defendants)

73.     Plaintiff incorporates the foregoing paragraphs 1 through 72 as if fully set forth herein.

74.     National Securities, National Holdings, and B. Riley through their agent, intentionally and negligently made various material misrepresentations concerning, *inter alia*, the risky and speculative nature of the investments in Moses's accounts, Moses's likelihood of success, the rate of return on Moses's investments and any applicable commission structure.

16

75.     Sherwin intentionally failed to disclose numerous facts, including but not limited to the risky and speculative nature of the investments in Moses's accounts, the volume of trading in Moses's accounts, Sherwin's trade strategy and success, and the rate of return on Moses's investments and commission structure. Sherwin further concealed his intention to engage in an aggressive trading strategy for the purpose of churning the account, and that he would charge excessive and unreasonable commissions relating to such trades. Finally, Sherwin concealed his intention to disregard Moses's express instructions not to sell the Palantir shares.

76.     National Securities, National Holdings, and B. Riley knew or should have known of the false misrepresentations when made, and at such time, knew or should have known they were false and made with the intent to deceive, defraud, and induce Moses to maintain the remainder of his funds with them and to prevent Moses from monitoring all trading activity in this account.

77.     Moses was unaware of the falsity of the representations, believed them to be true and relied upon them.

78.     National Securities, National Holdings, B. Riley and Sherwin, without Moses's informed consent, wrongfully, intentionally, fraudulently, maliciously, and deceptively manipulated Moses's assets. Each further executed transactions for the purpose of generating commissions and profits for themselves with complete and total disregard for Moses's financial and investment needs and objectives.

79.     National Securities, National Holdings, B. Riley and Sherwin's misrepresentations and omissions caused Moses to suffer serious economic harm.

80.     As a result of National Securities, National Holdings, B. Riley and Sherwin's fraud, Moses has been damaged in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**

**CHURNING - EXCHANGE ACT § 10(b) AND SEC RULE 10b–5**
**(all Defendants)**

81.     Plaintiff incorporates the foregoing paragraphs 1 through 80 as if fully set forth herein.

82.     This Count is alleged and contains claims against the Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, thereunder.

83.     National Securities, National Holdings, B. Riley and Sherwin exercised control over Moses's accounts.

84.     National Securities, National Holdings, B. Riley and Sherwin engaged in excessive trading of securities in light of the character of Moses's accounts.

85.     National Securities, National Holdings, B. Riley and Sherwin acted with fraudulent intent and/or with willful and reckless disregard for Moses's interests.

86.     By virtue of National Securities, National Holdings, B. Riley and Sherwin's excessive trading, they collectively received at least $372,716.13 in commissions from Moses.

87.     The Defendants used, or caused to be used, means and instrumentalities of interstate commerce or of the mails in furtherance of the fraud.

88.     As a direct and proximate result of the Defendants' violations of Exchange Act Section 10(b) and SEC Rule 10b-5, Plaintiff has suffered damages and is entitled to an award of compensatory damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### NEGLIGENT SUPERVISION
### (National Securities, National Holdings, B. Riley)

89.     Plaintiff incorporates the foregoing paragraphs 1 through 88 as if fully set forth herein.

90.     National Securities, National Holdings, and B. Riley failed to maintain and enforce a reasonably adequate system of internal supervision and control over its representatives, employees and/or agents in order to prevent the abuses referred to herein and, therefore, National Securities, National Holdings, and B. Riley did cause, participate in, approve and accept the benefits of the fraudulent and deceptive schemes and practices that occurred.

91.     At all times pertinent to the allegations of this Complaint, National Securities, National Holdings, and B. Riley employed agents who discharged their duties under the direction and control of National Securities, National Holdings, and B. Riley and their duly authorized representatives, including Sherwin and other employees who assisted in the handling of Moses' investments. All acts of National Securities, National Holdings, and B. Riley's respective employees were within the scope of their authority and course of their employment and within their usual course of business. National Securities, National Holdings, and B. Riley knew, or had reasonable grounds to know and, in fact, had a duty to know, that the acts alleged herein were committed.

92.     The acts of National Securities, National Holdings, and B. Riley and their respective agents were done by them personally, either while present in, or by the use of the mails and other instrumentalities of interstate commerce, to and from the Southern District of New York.

93.     By reason of the foregoing, Moses has suffered damages and is entitled to an award of compensatory damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### CONVERSION
### (all Defendants)

94.     Plaintiff incorporates the foregoing paragraphs 1 through 93 as if fully set forth herein.

95.     Moses sent Sherwin $100,000 for the specific purpose of the purchase of pre-IPO Lyft shares to be registered in Moses' name. While Sherwin purchased the shares, Sherwin never registered the shares to Moses.

96.     Despite numerous requests for the shares to be registered to Moses, to date, the shares are not registered to Moses.

97.     The Defendants maintain control over the Lyft shares. The Defendants failed to take the action which they were instructed to with respect to the funds, converted the funds for their own use, and have refused to return the shares to Moses, despite numerous demands.

98.     Accordingly, Moses has suffered damages as set forth below.

## SIXTH CAUSE OF ACTION

### BREACH OF CONTRACT
### (all Defendants)

99.     Plaintiff incorporates the foregoing paragraphs 1 through 98 as if fully set forth herein.

100.    A valid and binding contract existed, wherein, for consideration, the Defendants agreed to purchase $100,000 worth of pre-IPO shares of Lyft for Moses. While the Defendants did purchase the shares, they failed to register the shares in Moses' name.

101.    The Defendants' failure constitutes a breach of the contract.

102.    Moses has suffered damages, specifically, he did not receive the shares for which he paid the Defendants. Furthermore, Moses did not receive the appreciation of the shares, he

could not exercise control over the shares sufficient to allow him to sell those shares before they sustained deep losses, nor was Moses able to collect interest on his initial investment. Moses has been further damaged by incurring costs and attorneys' fees to obtain the return of the shares.

103.     Accordingly, Moses requests this Court grant judgment in favor of the Plaintiff for damages in an amount to be determined at trial, or alternatively, an amount based on the value of the shares on a date when a reasonable investor would have sold the shares, plus interest and attorneys' fees.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Plaintiff Michael Moses respectfully requests that this Court enter a judgment in favor of Plaintiff and against Defendants as follows:

A.     On the First Cause of Action, awarding damages in favor of the Plaintiff in an amount to be determined at trial, plus interest, punitive damages, attorneys' fees and costs;

B.     On the Second Cause of Action, awarding damages in favor of the Plaintiff in an amount to be determined at trial, plus interest, punitive damages, attorneys' fees and costs;

C.     On the Third Cause of Action, awarding damages in favor of the Plaintiff in an amount to be determined at trial, plus interest and punitive damages in the amount of treble damages for the Defendants' willful misconduct;

D.     On the Fourth Cause of Action, awarding damages in favor of the Plaintiff in an amount to be determined at trial, plus interest, punitive damages, attorneys' fees and costs;

E.      On the Fifth Cause of Action, awarding damages in favor of the Plaintiff in an amount to be determined at trial, plus interest, punitive damages, attorneys' fees and costs;

F.      On the Sixth Cause of Action, awarding damages in favor of the Plaintiff in an amount to be determined at trial, plus interest, punitive damages, attorneys' fees and costs;

G.      Awarding such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable of right.

Dated: October 19, 2022
      New York, New York

MICHELMAN & ROBINSON, LLP

By: /s/ Jared B. Foley

Scott D. Tenley, Esq.
17901 Von Karman Ave., 10th Floor
Irvine, CA 92614
(714) 557-7990
stenley@mrllp.com

Jared B. Foley, Esq.
Prachi M. Ajmera, Esq.
800 Third Avenue, 24th Floor
New York, New York 10022
(212) 730-7700
jfoley@mrllp.com
pajmera@mrllp.com

*Attorneys for Plaintiff*